United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHELE COLELLA AND DENISE DUSSAULT,

    Plaintiffs,

  v.

THE REPUBLIC OF ARGENTINA,

    Defendant.

No. C 07-80084 WHA

**ORDER GRANTING DECLARATORY RELIEF**

## INTRODUCTION

In this post-judgment execution action, defendant Republic of Argentina seeks a declaration that the Argentine presidential airplane is immune from execution. This order finds that declaratory relief is warranted and that the airplane in question is not subject to execution. Accordingly, defendants' motion is **GRANTED**.

## STATEMENT

Plaintiffs Michele Colella and Denise Dussault, citizens of Italy, are owners of bonds issued by Argentina. Argentina defaulted on those bonds in December 2001 during a financial crisis. In 2004, plaintiffs sued in the Southern District of New York to recover amounts due as a result of the default. Argentina had previously waived sovereign immunity for failure to make any payment of principal or interest on the bonds. On June 1, 2006, the New York court entered judgment in the amount of $6,787,965.28 in favor of plaintiffs, representing the full face amount of their bonds plus interest. Defendant Argentina did not appeal that judgment. To

date, Argentina has not made any payments on the judgment and has stated that it does not intend to satisfy the judgment (Armstrong Decl. Exh. A; Gleizer Decl. ¶ 6).

On March 26, 2007, plaintiffs received information that a Boeing 757 airplane owned by Argentina, with tail identification number T-01 — commonly referred to as "Tango Zero One" — was to be in San Francisco for maintenance and other servicing (without any diplomatic personnel) on March 27, 2007. Counsel for plaintiffs applied *ex parte* for a motion for writ of execution on the airplane. The key fact — that Tango Zero One was coming to the United States — was supported by a single declaration by Guillermo Gleizer, a New York attorney who represents plaintiffs. Gleizer's declaration stated, in relevant part:

> 7. I recently learned that a Boeing 757200, Tail Number T-01 (the "Airplane"), owned by Argentina will be flying to the United States for scheduled maintenance service at a United Services Maintenance Center and that the pilots will receive training, also at United Services. I am informed and believe and thereon allege that United Services maintenance center in San Francisco is its largest maintenance repair and overhaul center and that it conducts pilot training at its facility in Denver. Based thereon, I believe that the Airplane will be in San Francisco or Denver while it is in the United States.
>
> 8. I was also informed that the Airplane on prior occasions has been used to transport Argentinean President Nestor Kirchner, but that on this particular flight the only persons on board the Airplane will be two pilots. It is my understanding that the pilots will be carrying a significant amount of cash with which to purchase fuel.
>
> 9. Upon information and belief, President Kirchner also flies from time to time on Boeing 747s which are chartered to Argentina. The current Presidential fleet also includes two Fokker F28s, a Learjet 60, a Rockwell Sabreliner, and several helicopters.
>
> 10. It is my understanding that Argentina has pre-paid United Airlines and/or its affiliates, including without limitation, United Services, for the service to be performed on the Airplane and for training for the two pilots.

(*Ex parte* App. Exh. C).

After an *ex parte* hearing on March 27, the Court granted plaintiffs' motion and issued a writ of execution that expired at 4:00 p.m. on March 28. Plaintiffs were ordered to serve the order and writ of execution on Argentina's counsel to allow Argentina to move to modify or vacate the writ. A hearing was set for March 29.

2

1   On March 28, after receiving unconfirmed word from the United States Marshal that an
2   airplane matching the description of Tango Zero One was "coming in," counsel for plaintiffs
3   requested that the Court extend the writ until March 29, 2007. The request was granted.
4   On March 29, counsel for both sides appeared for a hearing on Argentina's motion to
5   vacate the writ of execution, Argentina having been notified of the proceedings. In its motion,
6   Argentina represented that the airplane at issue was *not* in the United States. Plaintiffs had no
7   evidence to the contrary. Based on Argentina's representation, the Court vacated both previous
8   writs of execution. The Court allowed Argentina to file a "motion to quash or other appropriate
9   motion" to allow any remaining issues to be resolved. Argentina filed the instant "motion to
10  dismiss."

**ANALYSIS**

**1.  PROCEDURAL POSTURE.**

In the instant motion, Argentina seeks "dismissal" of the entire proceeding pursuant to Federal Rule of Civil Procedure 83(b). Plaintiffs contend that this is an inappropriate vehicle and that there is nothing to "dismiss" in this case. Central to Argentina's motion, however, is a request for a declaration that Tango Zero One is immune from execution under the Foreign Sovereign Immunities Act and under international law. The substance of the procedural posture of the instant motion is that of a counterclaim for declaratory relief by Argentina. The mootness, ripeness, and standing issues, discussed below, are the same as those that would arise in a declaratory relief action. Additionally, the facts as alleged in the *ex parte* motion are the same facts upon which Argentina seeks relief in the instant motion. Accordingly, this order will construe the present motion and record as a counterclaim by Argentina for declaratory relief. *See* Fed. R. Civ. P. 83(b) ("A judge may regulate practice in any manner consistent with federal law, rules adopted [by the Supreme Court], and local rules of the district.").

**2.  ARTICLE III REQUIREMENTS.**

Plaintiffs contend that the instant motion does not meet the Article III requirements for a live case or controversy. Plaintiffs raise ripeness, mootness, and standing challenges. "The ripeness and mootness doctrines are based in part upon the Article III requirement that courts

3

decide only cases or controversies." *W. Oil and Gas Assoc. v. Sonoma County*, 905 F.2d 1287, 1290 (9th Cir. 1990). "The ripeness inquiry asks 'whether there yet is any need for the court to act,' while the mootness inquiry asks 'whether there is anything left for the court to do.'" *Ibid.* (citing Wright, Miller & Cooper, Federal Practice and Procedure, 3532.1 (2d ed. 1984)). Because of the unique factual situation presented here, both the possible unripeness and mootness of the instant case are at issue.

### A. Mootness.

A federal court has no authority to address moot issues. The Supreme Court has held:

> A case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. The underlying concern is that, when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party. In that case, any opinion as to the legality of the challenged action would be advisory.

*City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (alterations, citations, and quotations omitted). In the Ninth Circuit, a case "will not be deemed moot if there is a reasonable likelihood that the parties will contest the same issues in a subsequent proceeding." *W. Oil and Gas Assoc.*, 905 F.2d at 1290–91. In addition, a "heavy burden" of persuading the Court "that the challenged conduct cannot reasonably be expected to start up again *lies with the party asserting mootness*." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000).

This action is not moot. This order finds a reasonable likelihood that the parties will contest the same issues raised in the *ex parte* application in a future proceeding. It is true that the writ of execution the Court originally granted was subsequently vacated. Plaintiffs, however, have expressed an intent to pursue a new writ if they learn that Tango Zero One is scheduled to come to the United States for service (Popovic Decl. ¶ 2). Moreover, Argentina claims that it wants to bring Tango Zero One to the United States for service.

Argentina's contention that it will eventually bring the aircraft to the United States for servicing is reasonable and credible. Tango Zero One is an American-made Boeing aircraft. As Luis Paris, Air Attaché to the Argentine Embassy in the United States, expresses in his declaration, the United States is the only country in which some repairs or maintenance of

4

1  Tango Zero One can be performed (2d Supp. Paris Decl. ¶ 9).  Additionally, Paris's declaration
2  states that "[t]here are times when the only, or the best, facilities for repairs are located in the
3  United States and it would be impossible or unreasonably difficult to send Tango Zero One to a
4  third country instead" (*id.* at 10).  While it is not absolutely certain that Tango Zero One will
5  come to the United States for servicing, plaintiffs have not overcome their "heavy burden" of
6  showing that the aircraft is not reasonably likely to do so.  Both parties have a legally
7  cognizable interest in the declaratory relief sought by defendants.  Plaintiffs incorrectly argue
8  that this case is moot.

### B. Ripeness.

10  Notwithstanding their mootness argument, plaintiffs also contend that any immunity
11  issues are also unripe for adjudication.  The ripeness doctrine is "drawn both from Article III
12  limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."
13  *Nat'l Park Hospitality Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003).  Two factors must
14  be considered in a ripeness analysis:  (1) the fitness of the issues for judicial decision, and
15  (2) the hardship to the parties of withholding court consideration.  *See Abbott Labs. v. Gardner*,
16  387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99
17  (1977).  This order holds that after consideration of the relevant factors, the issues on which
18  Argentina seeks a ruling are ripe for adjudication.

19  Argentina seeks a ruling on a live, concrete issue — whether bringing Tango Zero One
20  to the United States for service and maintenance fits within the "used for a commercial activity"
21  exception under the FSIA.  Plaintiffs suggest that Argentina seeks a ruling based on
22  hypothetical facts.  Not so.  Argentina's motion is based on the basic facts that plaintiffs
23  brought before the Court in the *ex parte* motion — that Tango Zero One was coming for service
24  and maintenance without the president or any other dignitary on board.  Plaintiffs do not dispute
25  that the *ex parte* motion was ripe for adjudication when it was brought.  That dispute — neither
26  hypothetical nor abstract — still needs to be resolved.  Adjudication will "resolve a real and
27  substantial controversy admitting of specific releif through a decree of a conclusive character."
28  *Earth Island Inst. v. Ruthenbeck*, 459 F.3d 954, 961–62 (9th Cir. 2006).

5

Moreover, there will be undue hardship on Argentina if these questions are not decided. Leaving the instant issues open will create uncertainty whether Tango Zero One can be brought into the United States without the prospect of seizure. This, in turn, would interfere with Argentina's ability to use the aircraft for all purposes, including undisputedly sovereign ones. It is possible that by declining to issue a decision now — and effectively preventing Argentina from bringing Tango Zero One to the United States for service and maintenance — the safety of anyone flying on the aircraft, including the president, will be endangered. These are important considerations that weigh strongly in favor of deciding these issues now.

### C. Standing.

Plaintiffs briefly argue that Argentina has no Article III standing and that it has not demonstrated that it has an "injury in fact" that is "(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Earth Island Ins.*, 459 F.3d at 960. Specifically, plaintiffs contend that there is nothing threatening Argentina's airplane in any specific or general way. As discussed above, however, the undisputed factual record here establishes that plaintiffs have stated that they *will* seek a writ of execution if Argentina brings the plane to the United States for service and maintenance. This ongoing threat to Argentina constrains its ability to service the aircraft and is "concrete and particularized," and not "conjectural or hypothetical." It is sufficient to confer standing on Argentina to seek declaratory relief here.

### 3. IMMUNITY UNDER THE FSIA.

The FSIA provides procedures for obtaining personal jurisdiction over a foreign state and "governs the extent to which a state's property may be subject to attachment or execution." *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004). Under Section 1609 of the FSIA, "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided" in Sections 1610 and 1611 of the act. *See* 28 U.S.C. 1609. The issue between the parties here is whether two specific exceptions apply — the "used for a

commercial activity" exception of Section 1610(a) and the "used in connection with a military activity" exception of Section 1611(b)(2).[1]

### A. Commercial-Activity Exception.

Section 1610(a) authorizes execution against property of a foreign state located in the United States only if the property is "used for a commercial activity in the United States." 28 U.S.C. 1610(a). Section 1610(a) states, in relevant part:

> The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if —
>
> (1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver . . .

Argentina does not dispute plaintiffs' invocation of this provision under Section 1610(a)(1) because Argentina waived its immunity with regard to any action to execute on judgments obtained against Argentina by bond holders (*Ex parte* App. Exh. A at 30, 52). The parties disagree, however, whether Tango Zero One can be considered "used for a commercial activity" while it is serviced and maintained in the United States. This order finds that Tango Zero One is not used for a commercial activity when — as was alleged in the *ex parte* motion — it comes to the United States for service and maintenance, even when that is the sole purpose of the entry into the United States.

In *Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1087 (9th Cir. 2007), the Ninth Circuit construed the term "used for" as it appears in Section 1610. The Ninth Circuit agreed with the Fifth Circuit that "[t]he phrase 'used for' in § 1610(a) is not a mere syntactical infelicity that permits courts to look beyond the 'use' of property, and instead try to find any kind of nexus or connection to a commercial activity in the United States." *Af-Cap Inc.*, 475

---

[1] The parties disagree whether plaintiffs or Argentina should carry the burden of proving or disproving immunity. This order need not resolve the question because even assuming that Argentina has the burden of proving Tango Zero One is immune from execution, it has carried that burden.

7

F.3d at 1087 (quoting *Connecticut Bank of Commerce v. Republic of Congo*, (*CBC*) 309 F.3d 240, 254 (5th Cir. 2002)). The "used for a commercial purpose" exception of Section 1610(a) is to be strictly construed; it is narrower than the language in Subsection (b), which permits execution on "any property in the United States of an agency or instrumentality of a foreign state *engaged in* commercial activity in the United States," regardless of how the agency uses the property. *See Af-Cap*, 475 F.3d at 1088–89. The Ninth Circuit concluded that property "is 'used for a commercial activity in the United States' when the property in question is put into action, put into service, availed or employed *for* a commercial activity, not *in connection* with a commercial activity or *in relation* to a commercial activity." *Id.* at 1091; *see also id.* at 1089 ("'[U]sed for a commercial activity' in § 1610(a) and 'in connection with a commercial activity' in § 1605(a)(2) are very different phrases. 'Used for' is 'more specific' and narrower than 'in connection with.'").

Here, Tango Zero One is employed for strictly non-commercial activities. It is only used to transport the president of Argentina in the president's official capacity, not his personal capacity (Supp. Paris Decl. ¶ 3; 2d Supp. Paris Decl. ¶ 3). Defendants have offered no evidence to rebut this fact. As the airplane that transports the president in the performance of his official duties, Tango Zero One is not subject to execution under the FSIA. Indeed, the Fifth Circuit has recognized in dicta:

> Consider an airplane owned by a foreign government and used solely to shuttle a foreign head-of-state back and forth for official visits. If the plane lands in the United States, it would not be subject to attachment or execution. The plane is not "used for" any commercial activity, in the U.S. or elsewhere. . . . [A] U.S. court could never under the terms of the FSIA confiscate a plane used solely to transport a foreign head-of-state on official business. Attaching the plane and selling it in execution of a judgment would go too far in interrupting the public acts of a foreign state.

*CBC*, 309 F.3d at 253. So too here. Because Tango Zero One's *only* use is to transport the president, it is thus *never* "put into action, put into service, availed or employed" for a commercial activity. *Af-Cap*, 475 F.3d at 1091.

The core of plaintiffs' *ex parte* motion — and their opposition to the instant motion — is that Tango Zero One is "used for" various commercial and non-commercial activities, of which

8

1  transporting the president is only one non-commercial use.  Plaintiffs concede that Tango Zero
2  One cannot be seized if it is carrying the president.  According to plaintiffs, however, when
3  Tango Zero One is being flown to the United States solely for service and maintenance, that is a
4  "commercial activity" for purposes of the FSIA.  Thus, in plaintiffs' view, a distinction must be
5  drawn between the "nature" of an asset and the "purpose" of a specific activity.  This is
6  incorrect.

7  That the presidential airplane requires periodic service and maintenance does not mean
8  that it is being "used for" commercial activity.  The airplane is still only "used for" transporting
9  the president.  Service and maintenance do not convert the airplane into an implement used in
10 commerce any more than filling its tanks with jet fuel would be considered a commercial use.
11 This order agrees with Argentina that the plane needs to be maintained and serviced, but it is
12 not "used for" maintenance and service, even when the president is not aboard.  *Af-Cap* held
13 that "use" is "most sensibly read to mean active employment for commercial purposes, and not
14 merely a passive, passing, or past connection to commerce."  *Id.* at 1088 (quoting *Jones v.*
15 *United States*, 529 U.S. 848, 855 (2000)).  Accordingly, this order holds that to the extent that
16 servicing Tango Zero One has *any* connection to commerce, it is only a passing connection.
17 Such servicing does not convert that employment into "use" for commercial activity.  *See Af-*
18 *Cap*, 475 F.3d at 1091 (holding that "determination [of whether property is used for a
19 commercial activity] will be made by considering the use of the property in question in a
20 straight-forward manner, with a proper appreciation of the fact that the further removed the
21 property is from the referenced commercial transaction, the less likely it is that the property was
22 used *for* that transaction.").

23 Under the Ninth Circuit's clear pronouncement in *Af-Cap*, this order holds that Tango
24 Zero One is not subject to execution because it is not "used for a commercial activity."
25 Argentina has shown that the airplane is not used for anything other than transporting the
26 president.  It is plain that servicing and maintenance must be performed on the airplane for it to
27 execute its sovereign functions safely.  But such acts do not transform the "use" of the plane
28 into a commercial one.

9

### B. Military-Property Exception.

The FSIA further provides for immunity of military property. Section 1611(b)(2) provides that "the property of a foreign state shall be immune from attachment and from execution if the property is, or is intended to be, used in connection with a military activity and (A) is of a military character, or (B) is under the control of a military authority or defense agency." As has been noted, the military-property exception avoids "the possibility that a foreign state might permit execution on military property of the United States abroad under a reciprocal application of the act [FSIA]." *All Am. Trading Corp. v. Cuartel General Fuerza Aerea Guardia Nacional De Nicaragua*, 818 F. Supp. 1552, 1556 (S.D. Fla. 1993) (quoting H.R. Rep. No. 94-1487 at 31, *reprinted in* 1976 U.S.C.C.A.N.. at 6630)).

This order holds that Tango Zero One "is, or is intended to be, used in connection with a military activity" as it is "under the control of a military authority or defense agency." 28 U.S.C. 1611(b)(2)(B). The president of Argentina, like the president of the United States, is the Commander-in-Chief of the Argentine Armed Forces. The president controls the armed forces, is in charge of their organization and distribution, and may appoint high-ranking military officers. Furthermore, the aircraft is maintained and operated by members of the Argentine Air Force. When it is flown to foreign countries, it is manned by members of the Argentine Air Force and remains under the supervision of members of the Argentine Air Force (2d Supp. Paris Decl. ¶¶ 7–10; Supp. Paris. Decl. ¶ 6). These facts establish that Tango Zero One qualifies under the military-property exception to the FSIA.

The same facts also establish that Tango Zero One "is of a military character." 28 U.S.C. 1611(b)(2)(B). In *All American Trading Corp.*, the district court found that two Nicaraguan military aircraft that had been sent to the United States for repairs and upgrades were protected by the military-property exemption. The court there observed:

> The fact that the aircraft were being altered for more luxurious accommodations does not render them nonmilitary. If this were the case then Air Force One, and many other of the more luxurious military planes used to transport military officials, would not qualify as property used in military activity and of military character. This Court does not believe that is what Congress intended when enacting § 1611(b) as there is nothing in the history of § 1611(b) that implies that military property cannot have more

> accommodating configurations if it is used in military transport, rather than in combat.

*All Am. Trading Corp.*, 818 F. Supp. at 1555.  As with Air Force One, Tango Zero One is solely used to transport the president, the Commander-in-Chief of Argentina's military.  The transportation of military officials qualifies property as being "of military character."  To hold otherwise would frustrate foreign policy and open up the possibility "that a foreign state might permit execution on military property of the United States abroad under a reciprocal application of the act [FSIA]."  *Ibid.*

## CONCLUSION

This order **GRANTS** Argentina's motion for declaratory relief.  Tango Zero One is immune from execution by any federal court in the United States in aid of satisfying the civil judgment in favor of plaintiffs so long as it is in this country under circumstances contemplated by this order.[2]

**IT IS SO ORDERED.**

Dated:  May 29, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[2]  Plaintiffs' objections to the second supplemental declaration of Paris are overruled.  Plaintiffs' request for discovery is denied.

11